LEDBETTER *v.* SMITH.

4-6284                                         149 S. W. 2d 564

Opinion delivered April 7, 1941.

*G. R. Haynie,* for appellant.

*J. H. Lookadoo,* for appellee.

MEHAFFY, J.   This action was instituted by the appellant, Mrs. Leonard Ledbetter, in the Clark chancery court to cancel and set aside a certain deed alleged to have been made to one of the appellees, Mrs. Luther Smith. The suit was originally against Mrs. Luther Smith, Mrs. Tom Horton, and Mrs. Une Matthews.

It was alleged in the complaint filed by appellant that the plaintiff and defendants are the only heirs and next of kin to one Ella Kirby, deceased, who died in Clark county on March 9, 1939.  The original defendants were the daughters of said Ella Kirby, and the plaintiff was a granddaughter.  Mrs. Ella Kirby had three daughters and one son who died in 1916.  It was alleged that at the time of the death of Ella Kirby she was seized and possessed of the land described in the complaint, and that defendants were making a claim to the title of

said lands by virtue of a purported deed in the possession of defendants and alleged to have been executed by the said Ella Kirby, purporting to convey the lands described to Mrs. Luther Smith. It is alleged that the deed is not a true and genuine deed, but that the same is false and fraudulent and a forgery; that said deed casts a cloud on the title of plaintiff, Mrs. Leonard Ledbetter, to a one-fourth interest in said lands. It is further alleged that if the deed is found not to be a forgery that the said Ella Kirby was so physically and mentally weak by long and continued illness that she was incompetent and incapable of knowing and understanding the legal effect of said deed, and that while she was in that condition she was pressed and overpersuaded by the defendants in whose care she was during her last illness, to execute said deed, she being unable to resist their appeals and persuasions; that if Ella Kirby signed the deed, said act was not a free and voluntary act on her part, but was the result of a deliberate and wicked conspiracy on the part of defendants to defraud plaintiff out of her interest in said lands by taking advantage of said Ella Kirby while in her weakened and disabled condition, and inducing her to execute same; that since the death of Ella Kirby the defendants have sold and caused to be cut and removed from said land a large portion of the valuable timber standing and growing on said lands, which was done for the purpose of cheating and defrauding the plaintiff; that the plaintiff has no way of knowing the extent of the value of the timber, but the information rests solely with defendants. The prayer was for a cancellation of the deed, and that the defendants be restrained from exhibiting the same as evidence of their title to said lands, and that the plaintiff be decreed the owner and titleholder to an undivided one-fourth interest; that the defendants be ordered and directed to file a verified, itemized statement, showing the amount of each kind and character of timber cut since the death of said Ella Kirby, and the price received therefor, and that they be ordered to account to plaintiff for one-fourth of the amount.

Thereafter there was an amendment to the complaint filed stating that subsequent to the filing of the suit Mrs. Luther Smith filed for record in the recorder's office of Clark county the deed referred to in plaintiff's complaint, and alleged to be a forgery; that said deed is dated June 18, 1930; that said deed purports to have been executed for the land described in plaintiff's complaint; that there was no valid consideration for said deed.

Answer was filed denying the material allegations of the complaint, and alleging that the deed was a true and genuine conveyance. There was also an answer filed to the amendment to the complaint denying every material allegation in the amendment.

Evidence was introduced and the court made a finding and entered a decree that there was no equity in plaintiff's complaint, and that the same was dismissed for want of equity. An appeal was prayed and granted to the Supreme Court, and the case is now here on appeal.

Appellants argue that there are four issues of fact presented by the appeal. First, is the deed in controversy a genuine deed of conveyance, or is it a forgery?

The appellee, Mrs. Luther Smith, was called by the appellant as a witness, and testified that she was one of the daughters of Mrs. Ella Kirby; that there are three living children, Mrs. Matthews, Mrs. Horton, and witness; they had one brother who was killed a good many years ago. Witness testified that her mother at one time owned all the lands involved in this suit, but she thinks there was some of it she did not own; witness was married to Mr. Smith in 1904, and they moved into the house with witness' mother after the brother was killed in 1916; the brother lived in the house with the mother before his death; he was separated from his wife; witness' mother said to her: "I picked you out of the three children to come and live with me. You have always attended to my business, attended to the taxes, drawn all the checks from the government," and everything that was done, witness attended to; witness lived with her mother continually after that until her mother's

death; Mrs. Matthews lived about a half mile from there part of the time; her other sister lived in Little Rock part of the time and in Gurdon; there were 20 or 30 acres in cultivation; there were 40 acres in the home place; it did not all join; witness' mother gave both of her sisters 40 acres of land which joined; she kept this property and it was assessed in her name until she died; witness attended to it for her; about two years before she died she had rheumatism in her arm and she did not do anything after that; about two years before she died she got in feeble health; she had an account in the Clark County Bank and got money out of the bank by giving witness checks; she was to give checks and attend to it just like it was hers; whatever rents she collected she deposited in the bank at Gurdon; she came to the courthouse and signed checks for her taxes; she signed a check or two while she was in bed sick; sometimes she would give witness blank checks and witness would fill them out afterwards; witness had one with her; witness and her mother kept their papers together in the locker; witness kept the keys part of the time and her mother part of the time; when her mother was sick witness had to go to town after the doctor and look after other things, and she gave the keys to Mrs. Matthews; her mother paid the taxes because she wished to do so and wished to handle the property as though it was hers until her death; witness told Mrs. Matthews to come up any time she wanted to and Mrs. Matthews and Mrs. Horton knew about this deed and it was understood that the property was all witness'; witness owned everything; witness was present when the deed was made; does not know just who was present, but knows that her mother, her aunt, Mrs. Sallie Slaughter, and Ross Calloway were there; Mrs. Slaughter is dead; her grandfather was named Nash, and her grandfather on her father's side was named Kirby; witness does remember her mother's father, but her father's father was dead when she was born; when witness' mother's father died he had several children; some of them live in El Dorado and different places in the state; witness was present when the deed to her was executed, and carried it home; her mother

gave her the deed on the way home; part of the time the deed was in the locker and witness brought it to Arkadelphia when she came to pay taxes; had all the deeds. When asked why she did not put the deed on record, witness answered that she had about a dozen that she had not recorded, one from her sister, Mrs. Horton, 15 years ago; she had ten or fifteen deeds that did not come from her mother that were not on record; does not know whether she told her sisters about the deed; thought it was generally understood. When asked about the personal property witness said that she stayed there and took care of her mother and attended to her business, and her mother just wanted to give it to her; she looked after the crops and the planting of them and her mother got the money for them because her mother told her that at her death witness would be rewarded for what she was doing; does not know whether her sisters knew about the deed or not; she did not tell Mrs. Matthews that she would "go to hell" before she would give anybody any of the personal property; she did not tell anybody that she would kill anyone who testified against her; Ross Calloway was present when the deed was executed and saw it executed; witness brought the deed to Arkadelphia and showed it to the deputy clerk, Dixie Tolleson, before suit was filed; after she showed the deed to the deputy clerk she might have told her that she would have it recorded later; witness had abstract made to the land for her mother and paid $100 for it herself, out of her pocket; her grandfather Nash made a will to witness, but it amounted to nothing; her grandfather was living with her and died at her home; the will was never probated; it was for such a small amount and some of them got mad about it, and she never did anything about it; the land brought $160; her grandfather had a justice of the peace to come to her house and make the will; her brother was killed in 1916 and witness moved to her mother's house the next day; her mother wanted her to come and live with her; she lived with her 23 years; she gave the witness the deed in 1930; witness had then lived with her 14 years; she used no force or persuasion of any kind to get her mother to make the

deed; she never threatened anybody about the testimony they might give; never tried to get anyone to testify to anything other than the truth; attended to all her mother's business; there was no secret about her property; turned the key over to Mrs. Matthews; Mrs. Matthews could have gone into the closet any time she wanted to and looked at the papers; she collected the rent for her mother and deposited it to her mother's credit; her mother would give her checks to pay the taxes; the government cotton checks were made payable to her mother; witness came to Arkadelphia to the courthouse and signed for them; she signed for the checks and the money was paid to her mother as being the owner of the land; her mother said to let it go in her possession, and at her death it would be witness'; her mother had about $600 in the bank before she died; and she gave witness checks and told her to get the money and pay all her funeral expenses and all expenses and what was left would be witness'; she checked the money out before her mother's death; her mother told her to do this; her mother had $14 in her pocket and she gave this to Mrs. Matthews; Mrs. Ledbetter got the insurance money and did not pay a dime on her father's funeral expenses; she was an infant at that time; witness has a check in her pocket signed by her mother the year she made the deed; she looked up some of the old checks made the same year, and the original check referred to was here introduced in evidence. She said the signature to the deed was her mother's; she saw her sign it. The deed was offered in evidence.

Mrs. U. P. Matthews testified in substance that she was one of the daughters of Mrs. Ella Kirby, and at the time Mrs. Kirby died she lived something like a quarter of a mile from her; the first witness knew of Mrs. Kirby's being unable to do anything much was in August before she died in March; during that time she was not very stout; she was confined to her bed about two weeks before she died March 9th; when she first went to bed witness stayed with her until she died; never left her; witness' sister, Mrs. Smith, was around there, but she

had to come to town a lot; the doctor wanted to hear from her mother and she had to have a little medicine; Mrs. Smith had an automobile and drives a good deal, but from the time Mrs. Kirby took sick until she died witness and a nurse were with her; never saw any difference in her mother's feelings toward her children; she was just as devoted to her other sister and witness as she was to Mrs. Smith; witness' father died when she and her husband were married, and her father gave them all a 40-acre tract and said he wanted them to settle around him, and they did; she never heard of the deed until after her mother's death; really does not know when she found out about the deed; witness' mother had some money in the bank at Gurdon, and Mrs. Smith told her she checked it out; does not know that she told her why; and does not know whether she got the money before or after her mother's death; the amount of $600 was checked out and the account closed; prior to August her mother was well so far as she knew; she could outwalk witness; she did not need anyone to wait on her that witness knows of; she looked after her stock and kept feed in the barn; had a pretty good bunch of cattle and hogs; she had a check in her possession with her mother's signature; thinks she saw her sign it in 1937. The check was introduced as Exhibit 3. After her mother's death Mrs. Smith came up to witness' and got the keys and told witness they would divide everything; did not know of Mrs. Smith having any papers in the closet; she got the keys after her mother's death; kept them about two weeks, and gave them back to Mrs. Smith; never did go to the closet or look through any of her mother's papers; nothing was said about dividing the personal property, and Mrs. Smith said she intended to hold it; she told Mrs. Horton and Mrs. Horton said she intended to have her part of it; witness told Mrs. Smith that she could have her part, that she would not have a rucus in the family; she was asked if Mrs. Smith did not tell her that she would "go to hell" with anybody before she would give them any of that personal property, or words to that effect, and she answered "Yes." Her mother never said anything to her about giving this land to her

sister; she wanted it equally divided except the home-place; she wanted Mag and Luther to have that; her mother did not want any squabble over her property, but wanted it equally divided; it was understood when Mrs. Smith went to live with her mother that she was to have the homeplace; witness' mother, about two weeks before she became sick, spent the night with witness; she said she did not want any squabble over her property; wanted it divided equally; Mrs. Smith did look after her mother, but her mother looked after the farm herself; her general health was good; after witness' father died the mother asked witness to come and live with her and one of her other sisters talked about going there, but after that Mrs. Smith went there; witness never supposed that any deed had been made; knew nothing about it; Mrs. Smith talked to her about dividing the property, but after the deed showed up witness did not ask her any more about it; she feels that she has as much right to hold the property as Mrs. Smith; she is not having anything to do with Mrs. Ledbetter having any part of the property; witness was defendant because she was one of the sisters; she did not authorize anyone to answer for her; attorney told her it was a joint answer, and she said she did not authorize anybody to file the answer; she is not making any fight against Mrs. Ledbetter; does not know anything about it; attorney for plaintiff then asked witness if she wanted to remain as a defendant or wanted to be made a plaintiff so everyone could get her part of the property; she answered that she thought everyone should get her part, but she wanted the court to know that she was not fighting anyone; does not know of her mother ever keeping anything hid from her. Attorney for defendant asked on cross-examination if witness, Mrs. Horton, and Mrs. Smith did not come to his office when suit was filed and she said she did not; thereupon, the attorney for the defendant asked that the record show that the answer was stricken as to Mrs. Matthews. The attorney for plaintiff then asked witness if she was willing to join as a party plaintiff; she said it did not matter to her. Asked if she would know her mother's handwriting

if she saw it, she said she thought she would. She was handed the deed and asked if she recognized that as her mother's handwriting; she said she did not know, but it looked a lot like her writing.

U. P. Matthews, husband of Mrs. Matthews, testified in substance that he heard Mrs. Kirby talk about the division of her property twice; she said she had a will and did not want any rucus over her property; she. said that Mrs. Smith and her husband were to get the homeplace and she wanted the other property divided equally; that is practically the statement that she made; witness considered Mrs. Kirby a mighty healthy old lady for her age; she was active around the place; two years before her death you could see that she was going down; she was 77 years old and until shortly before she died she was pretty active and able to look after herself; she seemed to be as devoted to one of her children as the others; Mrs. Kirby sold timber to John Gaston; witness measured the land for Mrs. Kirby; thinks Mrs. Kirby paid Mr. Scott for clearing the land; does not know whether Mrs. Smith paid it or not; Mrs. Smith has not sold any timber since Mrs. Kirby's death.

Mrs. Lyde Matthews was recalled; does not remember exactly when Mrs. Smith told her she had the deed; the signature on the deed looks something like Mrs. Kirby's signature.

Henry Fourcht testified in substance that he knew Mrs. Kirby in her lifetime, and she requested witness to help measure some land, which she claimed was hers; never heard Mrs. Kirby talk about her purpose in dividing her land; visited the home of Mrs. Smith and Mrs. Kirby every once in a while; knows they lived in the same house; until the year before Mrs. Kirby died she was pretty active for her age; witness' transactions with reference to anything about the land was always with Mrs. Kirby.

Mr. Flave Carpenter testified in substance that he had lived in Arkadelphia all his life and was connected with the federal government in the tick eradication government work in Clark county; was acquainted with

Mrs. Kirby for 20 years; witness was at Mrs. Kirby's home in 1938 and heard her talk about what division she was going to make of her property; that she was going to leave her property with Luther and Mag.

U. P. Matthews was recalled and testified in substance that he remembered when Mr. and Mrs. Smith moved into the house with Mrs. Kirby; it was the winter of 1916; his understanding was that Mr. and Mrs. Smith would get dissatisfied and would tell the old lady they were going to leave if they did not get more land so she deeded them 40 acres of land, and she said when they wanted more she told them they could move if they wanted to and she did not deed them any more; does not know the date of this conversation.

Mrs. Susie Horton testified in substance that she attended her mother's funeral and did not hear Mrs. Smith say at any time that she wanted them to all get together and divide the property; does not remember when she first heard about the deed; her mother never told her anything about it; thinks her sister, Mrs. Smith, attended to practically all of her mother's business; witness lived in Gurdon; moved there the first of December before her mother died in March; witness said that she would not give $600 for all the property her mother had; Mrs. Kirby told witness she was going to make a will; she said she thought she knew her mother's signature; that she wrote to witness regularly; this is her signature on the deed and on the checks. Asked if she thought the signatures on the checks were similar to the one on the deed she answered: "Certainly they are her signatures, that is too, they are all her signatures." Witness is not an expert on handwriting, but has been in public business several years; does not remember her sister making any threats against folks who would testify against her.

John Gaston testified about buying the timber from Mrs. Kirby and thinks the land was known as the Kirby land; negotiated the deal with Mrs. Kirby; just talked to her; took a timber deed signed by Mrs. Kirby, Mrs. Matthews, Mrs. Smith, and Mrs. Horton; did not want

the deed without the signature of all of them; gave Mrs. Kirby $1,100 for the timber; he had no information that Mrs. Kirby owned the land; did not know anything about it.

Dixie Tolleson testified in substance that she is deputy clerk in Clark county; knows Mrs. Mag Smith and she filed in witness' office the deed in controversy, and it was recorded the same day; witness had seen the deed before it was recorded; she brought it for witness to look at and asked if it was a good deed; always wanted witness to look over her papers; wanted to know if witness could give her a cut on having a bunch of deeds recorded.

Ray Abbott testified in substance that he lives in Gurdon and is the cashier of the Clark County Bank of Gurdon; knew Mrs. Kirby during her lifetime; she carried an account in witness' bank; witness had with him the original ledger sheet showing her account covering the period of time from 1927 through March, 1939; the account was closed March 3, 1939. Witness then introduced the ledger showing the deposits and checks; he did not bring Mrs. Kirby's bank signature; he could not find it.

Mr. Charles Lehigh testified in substance that he had lived in El Dorado 18 years; that he was a questioned document expert on handwriting and typewriting; graduated from a college in which handwriting is taught and has had experience in passing on questioned documents about twelve years; has testified in some of the outstanding cases in the country, and names some of the cases; has examined the deed involved here; if he has an instrument at his office or laboratory he examines it under a developer-microscope; if not in his office, he carries his own pocket microscope; has examined the check dated April 17, 1937, for $2.30 and another check dated June 28, 1937, for $50, and has examined the deed involved. It is his opinion that the signature of the checks and the signature of the disputed document were written by two separate hands; he finds the signature of Ella Kirby on the deed, was apparently written about

the time of the check for $2.30. It appears that the name of Ella Kirby on the deed was written by a hand that was possibly trying to simulate the original signature; and that is due to the fact there are many breaks and it is written with a shaky hand, as they could not write it with a free hand; witness could not give a definite date when a signature has been written over a period of years, but can tell when a signature has been written in the last two or three years, or whether or not it is ten years old and whether it has been kept in a vault or exposed to daylight; this instrument was originally printed on a sheet of Magnolia Bond; that paper is manufactured by the Hammer-Company of Erie Pennsylvania; this sheet of paper was not released by the Hammermill Paper Products Company for distribution in the south until 1931; it is not a good grade of paper; witness can testify from the facts he had just given that sheet of paper was not printed until 1931; that deed was printed in Arkadelphia; the checks dated April 17, 1930, and June 28, 1937, were not written by the same hand as the signature on the deed; the signatures on the checks are similar, but they do not correspond with the signature on the deed; cannot tell how old the signature of the notary on the deed is, but can say in proof to his own satisfaction that the signature is not ten years old; the signature of the notary on the deed does not appear to have faded in any way, except it is just naturally dry and has turned blue-black; the deed is purported to have been signed by Ella Kirby on June 18th and acknowledged on June 11th; that could be due to a stenographic error. This witness also stated: "I would say that the signature on the deed apparently was written about the same time as this check for $2.30." The signature on the deed shows on its face to have been executed in 1930; it was apparently the same time as that of the check; witness said it appears to have been executed about the same time.

Ross Calloway testified that he knows Mrs. Mag Smith and her husband, Luther Smith, and was acquainted with Mrs. Kirby in her lifetime; went with them to

Arkadelphia and when they reached town he went about his business and when he got ready to go home found them in the Merchants & Planters Bank fixing up some papers; that is, Mr. Thompson was fixing it for them; witness noticed a warranty deed; Mrs. Kirby was making a warranty deed to Mrs. Smith; witness was there the day the warranty deed was signed; when witness went to the bank the day the deed was made, Mr. Thompson, Mrs. Smith, Mrs. Kirby, and Aunt Sallie Slaughter were there; she is dead; she was Mrs. Kirby's sister; he saw Mrs. Kirby sign the deed; does not think he has ever been in court before.

J. W. Thompson testified in substance that he is in the real estate business in Arkadelphia; was cashier of the Merchants & Planters Bank from 1927 to 1931; knew Mrs. Ella Kirby; wrote the deed on the day the acknowledgment was taken; he took the acknowledgment; would not have taken it if Mrs. Kirby had not signed it; that is Mrs. Kirby's signature.

The burden of proof is upon the party alleging that an instrument is forged. If he alleges forgery, he must prove it by a preponderance of the evidence. In this case, the only witness that testifies that this is not Mrs. Kirby's signature on the deed was Mr. Lehigh, who testified that he was a questioned document expert on handwriting and typewriting, and had experience for about 12 years; he mentioned a number of cases in which he had testified. He testified that the signature of Ella Kirby on the deed was not the same as the signature on the checks. He also testified that this particular paper, on which the deed was written, was not released for distribution in the south until 1931, and he says that the deed was printed in Arkadelphia. However, he testifies that the deed was apparently executed in 1930. Mrs. Smith, the appellee, testifies not only that it was her mother's signature, but that she saw her sign it. Mrs. Horton, sister of Mrs. Smith, testified that it was her mother's signature. Mrs. Matthews, another sister who was first made defendant, and afterwards changed to plaintiff, testified that it looked very much like her

mother's signature. J. W. Thompson, the notary public who took the acknowledgment, testified that Mrs. Kirby signed the deed; that he would not have taken the acknowledgment if she had not. Ross Calloway testified that he saw Mrs. Kirby sign the deed.

Appellant cites and quotes from the case of *Miles* v. *Jerry,* 158 Ark. 314, 250 S. W. 34, in which it is stated that it is easy to procure an appointment as notary. That opinion was written by the late Chief Justice HART, and he also said in that opinion: "As we have already seen, the burden of proof was upon them to show the falsity of the certificate, which carried with it the presumption that the officer making it had certified to the truth and was not guilty of forgery. In addition to the *prima facie* case made by the certificate of acknowledgment, we have the positive testimony of the notary and of another person accompanying him that the wife did acknowledge the lease."

It is true in the case at bar that in addition to the *prima facie* case made by the certificate of acknowledgment, we have the positive testimony of several witnesses who saw Mrs. Kirby sign the deed, and other witnesses who said that it was her signature on the deed, and there is no attempt to contradict this testimony by anyone except the expert.

In the case of *O'Kane* v. *First National Bank of Paris,* 189 Ark. 396, 72 S. W. 2d 537, this court again said: "The notary or other officer before whom an acknowledgment is taken performs a very important duty when he takes and certifies an acknowledgment of a deed or any instrument affecting the title to real estate. For that reason great weight is given to his official act in certifying to the validity of such instruments. The impeachment of his certificate involves a charge of criminal violation of duty on the part of the certifying officer." The court, to support this announcement of the law, cites the following cases: *Miles* v. *Jerry, supra; Clifford* v. *Federal Bank & Trust Co.,* 179 Ark. 948, 19 S. W. 2d 1026; *Anthony* v. *Pennington,* 182 Ark. 1039,

34 S. W. 2d 219; *Jolly* v. *Meek,* 185 Ark. 393, 47 S. W. 2d 43.

In the case of *Bell* v. *Castelberry,* 96 Ark. 564, 132 S. W. 649, it was stated: "It is a rule well settled by authority and several times announced by this court that where a grantor appeared and made some kind of an acknowledgment before an officer authorized by law to take such acknowledgment the recitals of the certificate of such officer, regular on its face, are, in the absence of fraud or duress, conclusive of the facts therein stated."

It is next contended by the appellant that if the deed is not a forgery, its execution was the result of overpersuasion and undue influence on the part of the grantee in the deed. We think the record fails to show any evidence of overpersuasion or undue influence. It is true that one witness testified that he heard Mrs. Kirby say that Mrs. Smith wanted her to deed her more land, and threatened to leave, but that conversation apparently took place seven or eight years after the deed was made. Other evidence shows that there was no undue influence, or overpersuasion. Mrs. Kirby's son was killed in 1916, and according to the evidence Mrs. Kirby requested Mrs. Smith, appellee, to come and live with her, and she immediately moved there. It was 14 years after she moved that this deed was made. Mrs. Horton, one of the sisters, testified that all the property her mother had was not worth $600, and no one disputes this.

It is next contended by the appellant that there was no delivery of the deed. All of the evidence shows that the deed was made in 1930, something like nine years before Mrs. Kirby's death, and Mrs. Smith testified that her mother gave her the deed on the way home, and that she took it to the collector's office when she paid taxes. There is no evidence to the contrary.

Appellant says that there was no consideration. The evidence clearly shows that as soon as Mrs. Kirby's son died in 1916, Mrs. Smith, at the request of her mother, immediately moved to her mother's house and took care of her from that time until she died in 1939.

The deed itself shows that the consideration was $1 and other valuable considerations, and about this there is no dispute in the evidence.

We think the chancellor's finding that the deed was genuine and that there was no overpersuasion or undue influence, and also his findings on the other two propositions, are supported by a preponderance of the evidence, and the decree is affirmed.